Griffin *v.* Wilcox.

---

*Per Curiam.*—The judgment is reversed, with costs.

*B. W. Wilson,* for the appellants.

*John S. Scobey* and *William Cumback,* for themselves.

<hr>

GRIFFIN *v.* WILCOX.

PROVOST MARSHAL—ARREST.—A Deputy Provost Marshal, directed by his superior officer to arrest and punish persons, not connected with the army, for retailing spirituous liquors, at their usual places of doing business, to soldiers, is not protected by such order, from liability to the arrested party, for damages on account of such arrest, because such order is illegal.

STATUTES CONSTRUED—CONSTITUTIONAL LAW.—The act of Congress of *March* 3d, 1863, assuming to indemnify officers for such arrest, is unconstitutional.

SAME—DAMAGES.—The right to damages to be recovered in civil actions of false imprisonment, is property, is a chose in action, and passes, in this State, to one's personal representatives at his death.

PRESIDENT OF UNITED STATES—HIS POWERS IN WAR.—The President of the *United States* has a right to govern, through his military officers, by martial law, when and where the civil power is suspended by force; in all other times and places the civil excludes martial law—excludes government by the war power.

HABEAS CORPUS, SUSPENSION OF WRIT OF.—Neither the President, nor the Congress, of the *United States*, can suspend the issue of the writ of *habeas corpus* by a State Court.

APPEAL from the *Marion* Common Pleas.

PERKINS, J.—The following general order was issued:

Griffin *v.* Wilcox.

"HEADQUARTERS DISTRICT OF INDIANA AND MICHIGAN,
*Indianapolis, June* 8, 1863.
*Capt. Wilcox, Provost Marshal, Indianapolis:*

" Captain: You will at once issue an order prohibiting the sale of liquor, by any party, to enlisted men. This order must be rigidly enforced. Any one violating it will be severely punished. I have noticed, with surprise, many intoxicated soldiers in our streets. This evil should and must be stopped. Very respectfully,

Your ob't servant,

G. COLLINS LYON,
Major and Chief Provost Marshal,
District of *Indiana* and *Michigan.*"

Capt. *Wilcox* thereupon issued the following notice:

"OFFICE OF PROVOST MARSHAL,
*Indianapolis, June* 8, 1863.

"All persons engaged in the traffic and sale of spirituous and intoxicating liquors, within this city, are notified that they are strictly prohibited, from and after this date, from selling the same to any enlisted soldier. A violation of this order, by any person whomsoever, will be visited with severe punishment. By order of

FRANK WILCOX,
Captain and Provost Marshal."

*Joseph Griffin* was arrested and imprisoned by Capt. *Wilcox,* for an alleged violation of the foregoing military order and notice. After his release, he commenced this suit in the *Marion* Common Pleas, against the captain, for false imprisonment. *Griffin* was licensed to retail to everybody except minors, intoxicated persons, &c., both by the State and the Federal Government.

Capt. *Wilcox* answered the complaint of *Griffin* by justify-

Griffin *v.* Wilcox.

ing his arrest and imprisonment under the order and notice above set out; and the Court held the justification sufficient, and a bar to *Griffin's* suit for damages. *Griffin* appealed to this Court.

Legal authority is a justification to a person in making an arrest. Authority, appearing on its face to be illegal, is not a justification, and will be no protection for making an arrest.

This case, it may be remarked, does not involve the question of the right, in any person, or body of men, to suspend the writ of *habeas corpus*. *Griffin* did not apply for that writ in order to effect his discharge from imprisonment. He submitted to that, and then sued for damages on account of the imprisonment. And, it may be here observed, that the suspension of the writ of *habeas corpus* does not legalize a wrongful arrest and imprisonment; it only deprives the party thus arrested of the means of procuring his liberty, but does not exempt the person making the illegal arrest from liability to damages, in a civil suit, for such arrest, nor from punishment in a criminal prosecution.

Our attention has been called to the following section of the act of Congress of *March* 3, 1863. (Acts of 1863, p. 154.)

"Sec. 4. *And be it further enacted,* That any order of the President, or under his authority, made at any time during the existence of the present rebellion, shall be a defence in all Courts to any action or prosecution, civil or criminal, pending or to be commenced, for any search, seizure, arrest, or imprisonment, made, done, or committed, or acts omitted to be done, under and by virtue of such order, or under color of any law of Congress, and such defence may be made by special plea, or under the general issue."

This act was passed to deprive the citizens of all redress for illegal arrests and imprisonments; it was not needed as a protection for making such as are legal, because the common law gives ample protection for making legal arrests and im-

Griffin *v.* Wilcox.

prisonments. The question here arises, then, can Congress enact that the citizen shall have no redress for a violation of his rights, secured to him by the following provisions of the Constitution of the *United States*, viz: amendments 4 and 5: " The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated;" " no person shall be deprived of his life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

These sections prohibit the passage of a law by Congress, authorizing the arrest of the citizen, without just cause, because such arrest deprives him of his liberty. They also prohibit the passage of a law depriving him, or authorizing the depriving him of his property, except through a judicial sentence, or upon just compensation. *Taylor* v. *Porter*, 1 Hill (N. Y.) R. 140; 1 Kent, 10th ed. 623, note; 2 *id.* 430, note. The right to damages, to be recovered in a civil action, for false imprisonment, is a chose in action—is property—and passes to one's representatives at death, by the law of *Indiana.* *Gimbel* v. *Smidth*, 7 Ind. 527. Hence it is assignable. *Strong* v. *Clem*, 12 *id.* 37. *Patterson* v. *Crawford, id.* 241, lays down the rule that such a right of action for a tort as would survive, is assignable, but overlooks the fact, decided in *Gimbel* v. *Smidth*, *supra*, that the right of action for false imprisonment survives.

The above section of the act of Congress can have no greater effect than that of a general pardon; but a pardon reaches the penalty for the crime only, not the civil right of property in damages. *The State* v. *Farley et al.*, 8 Blackf. 229; Brightley's Dig. p. 7, note. The act of Congress quoted can have no bearing upon this suit.

The real question, lying at the bottom of the case, involves the *war power* of the President of the United States; that is,

his power to act upon martial law without its having been first declared by the sovereign power of the State—an authority claimed by some to be a "mysterious power, undefined by law, unknown to the subject, which we must not approach without awe, nor speak of without reverence; which no man may question, and to which all men must submit;" but a power which we think exists only within limits capable of being defined with reasonable certainty. The question is one that we would gladly have avoided deciding; but from which, when legally brought before us, we have no right to shrink. It is one, too, the importance of which demands for it a careful examination before it is decided. And it may be further observed, in passing, that when martial law supercedes the civil, or is exercised concurrently with it, the civil being permitted, by mere military sufferance, or as a matter of convenience, where it does not interfere with, or is subservient to, the war power, the military assume the government of the citizens to just the extent they please. The assuming to prohibit the sale of liquor to soldiers in *Indianapolis* was upon this theory. So were the military orders prohibiting the sale of arms and ammunition to citizens in contravention of their constitutional right to procure and keep them. So were the arbitrary arrests for pretended disloyal opinions in violation of the constitutional right of freedom of thought and opinion. These, and other acts in disregard of constitutional and legal rights, all rest upon the same principle. If the military could legally arrest and punish *Griffin* for selling a glass of liquor to a soldier, they could legally arrest and punish him for expressing what they might assume to style a disloyal opinion. If they could not legally punish him for the one, they could not for the other. Could they do either? is the question.

This question we propose fully and fairly to examine, simply for the purpose of ascertaining the law. If we can come to the conclusion that the military possess this power, we will

Griffin *v.* Wilcox.

promptly concede it to them.   We would not rob them of an iota that they possess, and they will not seek an iota that is not theirs.   Knowing, as we do, personally, Capt. *Wilcox,* we feel warranted in saying that he has no wish, in the premises, but to legally discharge his duty.

*Griffin* was not arrested and imprisoned under the civil law of this State, nor of the *United States,* for he had violated no such law.   There is no act of Congress, nor of the State Legislature, prohibiting the sale of liquor to an enlisted soldier.   The only law in this State, containing such prohibition, when *Griffin* made his sale to a soldier, was that enacted by the military order of Major *Lyon.*   *Griffin* was arrested, then, by military authority.   Could he be legally arrested, for the cause alleged for his arrest, by that authority, in the place, and at the time it was so made?

*Griffin* was not connected with the military or public service, was not a spy from the enemy, and was not within military lines.   He was a citizen of the State, pursuing, lawfully, his lawful vocation, in the civil walks of life.   Had he been a soldier, in the service, he would have been subject to the well defined code of military law, which requires obedience by soldiers to the orders of their officers, and subjects them to punishment, by such officers, in prescribed modes, for disobedience to these orders.   In this case, had Major *Lyon* addressed his order to the soldiers subject to his command, forbidding them to drink intoxicating liquor, or to leave the lines to go where it could be obtained, and the soldiers, subject to his jurisdiction, had disobeyed his order, he might, perhaps, though the point is not now before us for decision, have caused them to be punished by military law.   Military men, in the service, are subject to the code of military law, enacted for their government, and to be enforced, in prescribed modes, by military officers.   So, legislative bodies administer the *lex parliamentaria*—the law governing legislatures.   It is

a special law for such bodies. But, as a general proposition, the citizen, in the civil walks of life, is not subject to military orders, nor to the *lex parliamentaria*, nor to punishment by military or parliamentary law. He is governed by the law of the land, administered in the Courts of justice. He may, sometimes, be subject to martial law, executed by military officers, as the agents of the king, president, or governor, as the case may be. When the citizen is governed by the military power, he is not governed by the soldier's code of military law, but he is said to be governed by martial law; and this law is perfectly distinct and entirely different from military law, to which soldiers are subject. When the military commander, as the agent of the king, president, or governor, governs the citizens, he does not rule them by the code of military law, enacted for the soldiers, as has been said, and for disobedience to which they are punished, but he governs the citizens by arbitrary will. See "Articles of War," for the government of soldiers, enacted by Congress, in Brightley's Dig. 73. We may further illustrate the distinction between governing and punishing those subject to the military code by military tribunals, and governing the citizen by martial law, which is, in fact, no law, but arbitrary will, by extracting a couple of sections from the act of Congress of *March* 3, 1863. Section 30 of that act reads thus:

"That in times of war, insurrection, or rebellion; murder, assault and battery with intent to kill, manslaughter, mayhem, wounding by shooting, or stabbing with an intent to commit murder, robbery, arson, burglary, rape, assault and battery with intent to commit a rape, and larceny, shall be punishable by the sentence of a general court martial or military commission, when committed by persons who are in the military service of the *United States*, and subject to the Articles of War; and the punishments for which offences shall never be less than those inflicted by the laws of the

State, Territory or District in which they may have been committed."

Section 38, of the same act, is as follows:

"That all persons who, in time of war or of rebellion against the supreme authority of the *United States*, shall be found lurking or acting as spies in or about any of the fortifications, posts, quarters, or encampments of any of the armies of the *United States*, or elsewhere, shall be tried by a general court martial, or military commission, and shall, upon conviction, suffer death."

Such is military law. What is called martial law, we again repeat, is applied to the citizen, by subjecting him to the government of the military, in certain exigencies. "Martial law is the law of war, that depends on the just but arbitrary power and pleasure of the king, for, though he doth not make any laws but by the common consent in parliament, yet in time of war, by reason of the necessity of it, to guard against dangers that often arise, he useth absolute power; so that his word is law. However opposed to other authorities, this expresses what is distinctly meant, both in *England* and in this country, by martial law." New Am. Cyclop. tit. Martial Law. The question now arises, when and where can the citizen be subjected to this martial law? He can not, certainly, without an act of Congress, be subjected to that law except upon necessity—occasioned by force, actually existing or immediately threatened, at the time and place where martial law is exercised. Whether, by act of Congress, martial law could be declared throughout the *United States*, we need not inquire. See DeHart, Mil. L. p. 17.

Martial law is the law of force, and is employed under two general conditions:

1. In a part, or the whole, of a foreign country, when, being at war with such country, our army may invade it, and expel the governing power from a part or the whole of it.

2. When force may expel the civil authority from a part or the whole of our own territory; or, perhaps, it may be said, martial law is exercised in our country, the military being on the spot to execute it, where no civil authority exists. But where the civil authority exists, the Constitution is imperative that it shall be paramount to the military. The right to govern by martial law does not grow out of the mere fact that we have an army; for we have that at all times, in peace as well as in war. The right to govern *Indianapolis* by martial law does not arise upon the mere fact that soldiers are stationed in the city, or are often marched through it; for soldiers are stationed at different points, and marched from place to place in the country at all times, in peace as well as in war. Yet, in ordinary times, surely the officers commanding them do not claim to govern the citizens, not connected with the army, by martial law.

The right, in the military officer, to govern by martial law, as we have said, arises upon the fact of existing, or immediately impending force, at a given place, and time, against legal authority, which the civil authority is incompetent to overcome; and it is exercised precisely upon the principle on which self-defence justifies the use of force by individuals. Robbers and burglars, and, in some cases, rioters may be resisted and even slain, in self-defence by private individuals. That is, there are cases where force must be resisted by force, instead of waiting for the civil authorities. This is the doctrine of *Rutherforth,* in his Institutes of Natural Law. See Book 1, chap. 19; Book 2, chap. 9. This is the doctrine expressed by the maxim, "*inter arma silent leges.*" This maxim was first applied under such circumstances. It was first laid down by *Cicero,* so far as we have been able to ascertain, in his oration for *Milo.* The facts of that case are thus stated: *Milo* was on his way to *Lanuvium.* *Clodius* met him on the road. *Milo* was in his carriage with his wife, and was accom-

Griffin *v.* Wilcox.

panied by a numerous retinue, among whom were some gladiators. *Clodius* was on horseback, with about thirty armed men. The followers of each began to fight, and when the tumult had become general, *Clodius* was slain, probably by *Milo* himself. *Milo* was prosecuted for murder. *Cicero* prepared an oration in his defence, in which he asserts that the right of self-defence, when we are attacked by force, is a principle and necessity of nature—that we can not, in such cases, incur the hazard of waiting for the law to protect us— that in such circumstances it may be laid down as a maxim, "*inter arma silent leges;*" that is, that in the midst of actual force, for *arma* is used as meaning force, the law is silent. *Rutherforth* uses the word force as signifying arms. He says contention by force, whether by individuals or governments, is war. *See ubi supra.* But because *Milo* had a right to defend himself when and where he was attacked, without invoking law; in short, because the laws were silent for an hour in the midst of the combat between *Milo* and *Clodius,* it was not contended that all law was suspended throughout the Roman Empire during the pleasure of the Executive power.

This corresponds with Lord *Coke's* idea of *Cicero's* maxim. He says:

"When the courts of justice be open, and the judges and ministers of the same may by law protect men from wrong and violence, and distribute justice to all, it is said to be time of peace. So when by invasion, insurrection, rebellion or such like, the peaceable course of justice is disturbed and stopped, so as the courts be as it were shut up, *et silent inter leges arma,* then it is said to be time of war." Coke upon Littleton, as quoted in Law. Wheat. Int. Law, p. 525.

There is another maxim sometime quoted in connection with the above from *Cicero,* which deserves a moment's notice. *Salus populi suprema lex*—the good of the individual

---

Griffin *v.* Wilcox.

---

must yield to that of the public. This maxim, also, is acted upon only locally and temporarily. *Broom* says of it: "Hence there are many cases in which individuals sustain an injury for which the law gives no action; as when private houses are pulled down, or bulwarks raised on private property, for the preservation and defence of the kingdom against the king's enemies. The civil law writers indeed say, that those who suffer have a right to resort to the public for a satisfaction, but no one ever thought that the common law gave an action against the individual who pulled down the house or raised the bulwark, and the reason is that a man may justify committing the private injury for the public good, as for instance, the pulling down of a house, if necessary, in order to arrest the progress of a fire." Broom's Maxims, page 1. See the subject of this maxim well discussed in 2 Kent 333, *et seq.*

These two maxims, and their application, illustrate and define martial law, under absolute governments; and, for the purposes of the case at bar, we shall concede the right to exercise that law, as thus defined and applied under our government, limited, as all its departments are, by a constitution. It is the law of force, applied to govern persons and places where the civil law is expelled; its officers rendered unable to execute it, by forcible resistance. The right, thus temporarily and locally to exercise martial law, in case of necessity, is the war power of the Governor of a State and of the President of the *United States*, and it is all the war power that either possesses by virtue of which he can assume to govern independently of the civil law; and this war power, each executive usually exerts through his subordinate military officers.

This may be further illustrated by examples.

During the administration of Governor *Wright*, as the Exexutive of this State, it was alleged that a rebellion existed in

*Clay* county—that the officers of the civil law were overpowered by force. Governor *Wright*, as commander-in-chief of the military power of the State, sent a military force to the county, the commander of which, as the representative of the Executive, would, if necessary, govern that locality by the war power, till the civil law could resume its sway; but because there was forcible resistence to law in *Clay* county, did that fact authorize Governor *Wright* to overthrow the civil authorities in the whole State, and assume unlimited arbitrary power, to be exercised through military officers?

During the administration of *Washington*, as President of the *United States*, a rebellion occurred in western *Pennsylvania*, on account of the excise law; the civil power was overcome, in that portion of the State. General *Washington* sent thither a military force, and, within the limits of the territory from which the rebels had expelled the civil power, and for just the time necessary to restore the ascendency of that power, *Washington*, by his Generals, might have found it necessary to govern by the war power. So *Washington* understood this question, and he instructed his officers accordingly. His instructions to them were:

" That every officer and soldier will constantly bear in mind that he comes to support the laws, and that it would be peculiarly unbecoming in him to be, in any way, the infractor of them; that the essential principles of a free government confine the province of the military, when called forth on such occasions, to two objects: first, to combat and subdue all who may be found in arms in opposition to the national will and authority; secondly, to aid and support the civil magistrates in bringing offenders to justice. The dispensation of this justice belongs to the civil magistrates; and let it ever be our pride and our glory to leave the sacred deposite there inviolate." Irving's Life of Washington, vol. 5, ch. 25.

*Rhode Island* presents a different example, but strictly with-

in the same principle; an example where the rebellion was not local, but throughout the entire State, and called into exercise the war power of a Governor of the State. *Rhode Island* is a very small State. Its territory does not exceed that of the three largest counties in *Indiana*. It was governed upon a royal charter granted by *King Charles the Second*, under which only freeholders to a certain amount and their eldest sons were entitled to vote. The people petitioned for a convention to form a new and more democratic constitution. The legislature, year after year, denied the petition. The people finally took the subject into their own hands, called a convention, formed a new constitution, and were proceeding, a great majority of the people engaging in the undertaking, in 1842, to overthrow, entirely to extinguish the old government and put the new one in operation in its place. Force was resorted to on both sides. The contest was not local, but extended to every foot of territory in the State. The legislature of the old government passed an act authorizing the Governor of that government to enforce martial law; he therefore announced it by proclamation, and then exercised it to the extent of forcible resistance to the old government, which was throughout the whole State. New Am. Cyclop. tit. Dorr; Burke and Causin's Reports to House of Rep., in Congress in 1844; *Luther* v. *Borden*, 7 How. (U. S.) Rep. 1. The charter Governor, *King*, also called on the President of the *United States* for aid to put down the rebellion; the President tendered it, and the people of *Rhode Island* were crushed by military power.

The right, then, of the President to temporarily govern localities, through his military officers, he derives solely from the fact that he is the commander-in-chief of the army, and is to see that the laws are executed; and he can exercise it to just the extent that, and no further than, by the laws of war, a commanding general in the army of the *United States* could

do it. Where the laws are, or may be, executed without the interference of the President, by his military, he has no right thus to interfere.

The President does not derive his war power from his oath to support, protect and defend the Constitution. That simply obliges him to obey the constitution himself, and to use the power which that instrument confers upon him, and none else, to cause others to obey it. He does not derive his war power from the right to suspend the writ of *habeas corpus*. We do not think he possesses that right under the constitution. We think that is an act of legislative power which can only be performed by Congress; and, even when rightly suspended, it does not justify an exercise of the war power beyond the necessities of the case, but simply takes away the means of obtaining liberty when illegally deprived of it. Simply because the *habeas corpus* is suspended, is it right to destroy every man's liberty and property? The right, in a case of emergency, to exercise the war power, temporarily and locally, supposing that power to exist at all, under the constitution, does not depend upon the fact of the *habeas corpus* being suspended, or not suspended.

And while upon this subject, it may not be improper to observe, that neither the President, nor Congress, has power to suspend the issuing of the writ of *habeas corpus* by a State Court. From this proposition, we take it, no jurist will dissent. Indeed, there is nothing in the act of Congress of *March* 3d, 1863, cited *supra*, that justifies the inference that Congress assumed to attempt such suspension. The operation of that act must be limited by construction within the constitutional power of Congress.

The provision in the Constitution of the *United States* touching the suspension of the writ of *habeas corpus* by the General Government, is in the 9th section of article 1 of that instrument, and the Supreme Court of the *United States*, in

*Barron* v. *The Mayor, &c., of Baltimore,* 7 Pet. (U. S.) Rep. 243, Chief Justice *Marshall* delivering the opinion, decided that the provisions of that section applied exclusively to the regulation of "the departments of the General Government," and had no application to the departments of the State Governments. We invite special attention to that case; also, to *Smith* v. *Maryland,* 18 How. U. S. Rep., and cases there cited, and to Sedgwick on Statutes, pp. 596, 612, 616; and Smith on Constitution and Statutes, p. 310.

So, the provisions in the Constitution of the *United States,* providing that property shall not be taken without compensation, and that crimes must be prosecuted by indictment, &c., only apply to the Courts and other departments of the General Government, and have no restraining power upon States, their Legislatures, or Courts. 1 Kent, Lecture 19; 9 Ind. Rep. 558. The suspension of the writ from our State Courts must come from the State Legislature. The statute law of our State requires the Courts to issue the writ; and the Constitution ordains, art. 1, sec. 26, that "the operation of the laws shall never be suspended, except by the authority of the General Assembly." Nor can "the Circuit Courts of the *United States* interfere with the jurisdiction of the Courts of a State." 1 Kent, p. 412. Nor can State Courts interfere with the jurisdiction of the *United States,* or her Courts; and, hence, while the State Courts have the undoubted right to issue writs of *habeas corpus,* in all cases, till a suspension of the right by the State Legislature, they have not a right to deliver persons held in custody by legal authority of the *United States.*

But to prevent such delivery of persons on *habeas corpus,* by a State Court, it must be made to appear to that Court, that the persons are held by authority of the *United States.* For example, a soldier is held under an enlistment by an officer of the *United States.* Is he thus held by authority of the

*United States?* If he is eighteen years old, or upwards, he is, because the law of Congress authorizes *United States* officers to enlist and hold such persons. If he. is under eighteen, he is not held by the officer under authority of 'the *United States*, according to the best judgment we can form, because no law of the *United States* authorizes him to enlist and hold such minor. Now, if the petition in such case, presented to a State Judge for a writ of *habeas corpus*, shows that the soldier is over eighteen, the judge should refuse the writ, not because he has not a right to issue writs of *habeas corpus*, but because the petition shows, in the given case, that he has not jurisdiction, the person being held under authority of the *United States*. But if the petition shows that the soldier is under eighteen, the State Judge would have jurisdiction, because no authority has been conferred by the *United States* to hold such persons in custody as soldiers; but the fact that the soldier was eighteen or upwards, might be shown to the Court by the officer, on the return of the writ, and in that event, the jurisdiction of the State Court might cease; and it might become its duty to remand the petitioner. The mode of proceeding in these cases is pointed out in *Ableman* v. *Booth*, 21 How. (U. S.) Rep. 506. See, also, 20 Ind. 499.

Congress can neither force jurisdiction upon State Courts, nor take it from them. The Courts of *Indiana* do not derive their power to issue writs of *habeas corpus* from the General Government, nor can that Government take it from them. But the State Courts can not extend their writs, when issued, into the domain of the General Government. .Prisoners in custody, by authority of the General Government, must go to the Courts of that Government for relief; and if that relief is suspended, they are without relief from the State Courts for want of jurisdiction. The Federal and State Governments are distinct and sovereign within their respective

spheres, and neither should be permitted to encroach upon the rights of the other.

The war power of the President, then, may be stated thus: He has a right to govern, through his military officers, by martial law, when and where the civil power of the *United States* is suspended by force. In all other times and places, the civil excludes martial law—excludes government by the war power. Where force prevails, martial law may be exercised. But in all parts of the country, where the Courts are open, and the civil power is not expelled by force, the Constitution and laws rule, the President is but President, and no citizen, not connected with the army, can be punished by the military power of the *United States*, nor is he amenable to military orders. See *Skeen* v. *Monkeimer*, ante, p. 1. If, in such parts of the country, men commit crimes defined by law, they must be punished, according to the Constitution and the law, in the civil Courts. If, in such parts of the country, men have not perpetrated acts constituting, in law, crimes, their arrest, trial, and punishment, by military courts, is but a mode of applying Lynch law; is, in short, mob violence. This is so, unless the old *English* tory doctrine of government is secretly included in our Constitution. That doctrine, as expressed by *Filmer*, is, that "a man is bound to obey the king's command against law; nay, in some cases, against divine laws." May's Const. Hist. vol. 2, p. 21, note. Such was the maxim, the constitution, indeed, of Imperial *Rome*. "*Quod principi placuit legis habet vigorem.*" What pleases the Prince, has the vigor of law. Coop. Just. Inst. p. 9; 1 Black. Comm. p. 74.

It is not denied that an officer of the navy or army, might plead the order of his government in justification of any act of war he might commit upon a foreign nation; but it will scarcely be seriously contended, we think, by any lawyer, that if the President should order a military officer to seize

Griffin *v.* Wilcox.

and execute a private citizen of the *United States*, who was quietly pursuing his lawful business, in a State not in rebellion, such officer could justify under the order of the President. If he could, the people are laboring under a delusion as to the force and effect of the Constitution of the Government. But we need not pursue this point, as in the case at bar no order of the President is shown. The command of a Provost Marshal is not necessarily the command of the President. See Law. Wheat. Int. Law, p. 189, note; and the great case of *The People* v. *McLeod*, 1 Hill (N. Y.) Rep. 377, S. C.; 25 Wend. 483.

Having ascertained the principle by which the legality of cases of military arrest and punishment is to be tested, we are now prepared to proceed to the application of the principle to the case at bar.

The existing rebellion in the *United States*, vast as is its extent, is not general, but local. It is confined to the Southern States. It is a sectional rebellion. The theatre of force, where the civil tribunals are closed, is sectional, bounded by geographical lines. It is limited to the slave States. This has been unanimously decided by the Supreme Court of the *United States* in the Prize cases. 2 Black's Rep. p. 635.

There are those by whom it is thought that great provocations have been given to the people of the Northern States, or portions of them, calculated to irritate them into joining in the rebellion; but, under all persecutions and grievances, the people of the Northern States, thanks to their patriotism, have remained true and devoted to the Government of the *United States*.

The rebellion itself did not originate in an attempt, as we have read its history, to overthrow the Government of the *United States*, and is not now ostensibly prosecuted for that purpose. The rebellion consists in an attempt, if we have read aright, to withdraw a certain portion of people and ter-

Griffin *v.* Wilcox.

ritory from under the jurisdiction of the Government of the *United States*—to divide the Union—leaving the North under the existing Government, and placing the South under a newly created Government. It is true that the rebel armies would, if they could, invade the territory of the Northern States, in order to relieve the rebel States from the desolation of war, without changing the object for which the war is prosecuted on their side, viz: their independence of the Union, or, perhaps, guarantees for rights in it. And, if our army was withdrawn, or greatly weakened before terms of peace were agreed on, the rebels would seize upon their independence, if they did not invade us. Hence, the imperative necessity, imposed on us, of continuing to keep up the army, to prevent this great evil, whatever ultimate purpose the administration may indirectly seek to accomplish by it, which could not be approved.

No one of the Northern States, constituting, as they together do, a decided majority of all the States, desires to overthrow the Constitution of the *United States*, or to withdraw from under its operation; nor do any considerable portion, perhaps not any, of the people of such States, manifest any desire to resist the legal execution of the Constitution and laws. Resistance to illegal arrests and mob violence is not necessarily resistance to the Government. The Courts, in all the Northern States, are and have been open. But the Southern States are attempting, by violence, to sever the Union; and the Government of the *United States*, and the people of the Northern States, are attempting, as they assert, to prevent the severance of the Union of these heretofore *United States*. Such is the object, on both sides, of the war; not to maintain or overthrow the old legal Government of the *United States*, but on one side, to continue the existence of, and on the other to sever, the territorial unity of the nation. And the opposition to the administration, (not the Govern-

Griffin v. Wilcox.

ment,) in the quiet, law-abiding States of the North, is not forcible, but a peaceful difference, and conflict of opinion and argument as to the cause of the rebellion, and the measures which should be pursued as best calculated to restore territorial unity, under the Government of our fathers, with the least destruction of property, the least sacrifice of life and constitutional liberty, and in the shortest possible time. And the question now is, does such peaceful conflict of opinion and argument justify the administration in subjecting those who differ with it to military power? For the case at bar, though perhaps not of that description in its facts, yet rests entirely upon the principle, as we remarked at the outset, of governing by martial law; as it would not be pretended that the military could make such arrest of the citizen as that involved in this case, in time of peace. We have found no legal principle that will justify such a course. We know of no precedent for such an exercise of war power as that above propounded, viz: of subjecting opponents, simply in political opinions, to martial law, for expressing those opinions; for such opinions are not force, nor is the expressing of them force, nor is it a crime by any law of the land.

There is one precedent upon this question to which we think it instructive to refer. When, in 1776, the *American* colonies rebelled against *Great Britain*, not to overthrow the *British* Government—that still stands—but to sever the *British* Union, to take the colonies out from under the jurisdiction of the *British* Government, *King George the Third* determined to go to great lengths in attempting to consolidate *British* public sentiment in support of his particular policy against the colonies. He laid down the two propositions, that the *British* Union should never be dissolved, and that the colonies should be subjugated by the sword to the sovereign will, uninfluenced by any reasonable or fair terms to be offered to invite submission. He went great lengths in attempting to unite the *Eng-*

*lish* people at home upon the idea of enforcing his platform by war alone. He used the patronage of the Government, in the shape of contracts and appointments, to corrupt; he spent enormous amounts in actual bribery, and resorted to various means of intimidation to produce a united *English* sentiment corresponding with his own. May's Const. Hist. vol. 1, pp. 30, 48; 2 *id.* 31. On page 52 of vol. 1 are extracts of letters from the King to Lord *North.* On the 4th of *February,* 1779, he wrote: "You may sound Lord *Howe;* but before I name him to preside at the Admiralty Board, I must expect an explicit declaration, that he will zealously concur in prosecuting the war in all quarters of the globe." Again, on the 22d of *June,* 1779, he wrote: "Before I will hear of any man's readiness to come into office, I will expect to see it signed under his own hand and seal, that he has resolved to keep the empire entire, and that no troops shall consequently be drawn from thence, [i. e. *America,*] nor independence ever allowed."

But the King could not produce unity of sentiment in his exclusive war policy. *Chatham, Fox, Burke, Barre,* and other true *Britons,* far-seeing statesmen and illustrious patriots, were for compromise, conciliation, along with war; they warned the King that his policy was less humane, less Christian, than theirs, and was calculated to prolong and increase the expenses of the war; that it involved the overthrow of liberty in *England* itself, and might even subject him, at last, in the dispensations of Providence, to the loss of the brightest jewel of his crown. These sentiments were boldly and earnestly uttered; they were read by the army and the rebel colonists; and, though it was attempted, by a few narrow-minded bigots, to throw distrust upon the patriotism of those great statesman, we have never learned that the King even claimed that their course gave him a right to arrest them by virtue of martial law. See 1 Buckle's Hist. Civ. p. 345. If the

Griffin v. Wilcox.

speakers, thought *King George* and its ministers, advocated erroneous doctrines, the intelligence of the soldiers rendered the army capable of discerning it, and avoiding being influenced by them; or, at all events, the fact did not justify the violation of the constitutional rights of the citizen to suppress them. And the proposition would certainly be a monstrous one, that all utterances of opinion may be prohibited for fear an erroneous one might be expressed; and we have in this country no legal censor, outside of the law, who has a right to set up his own opinions as a test by which the correctness of all others is to be determined. The foregoing is the precedent from *Great Britain.* We should be reluctant to seek others in *Spain, Austria, Russia, Turkey, Naples, Mexico,* or the so-called Confederate States.

We feel constrained, then, to come to the conclusion, that the war power of the President is limited to the simple right of exercising martial law, simply as a military chief, locally and temporarily, where actual or immediately impending force renders it a military necessity. No other doctrine can be reconciled with the Constitution of the *United States,* or is compatible with the liberties of the people.

The next question that arises is, how is the existence of the fact that the civil power is superseded by illegal, forcible resistance, to be ascertained? Is it a fact to be proved on the trial, or decided by the Court upon judicial knowledge? If the former, there is no averment in the answer of the existence of such fact, and it was bad for that reason. If the latter, we are able to state, with a feeling of complete assurance, that there has at no time been any forcible resistance, on the part of the people, to the civil power, in the city of *Indianapolis,* which the officers of the law were not easily able to overcome, when disposed to do their duty. The Courts have at all times been open, and there are a sufficiency of them here, including those of the city, State, and *United States,* to

meet the public necessities. And, extending our observation from the city to all parts of our Commonwealth, ·we are proud and happy in being able to say, in honor of the people and State of *Indiana*, that all the citizens of the State, with scarcely an exception, if indeed there is one, are, and always have been, eminently true and patriotic, and remarkably patient. Judge *Leavitt*, in the *Vallandigham* case, we regret to say, assuming to speak by judicial knowledge, but beyond question upon false and slanderous information, of the people of this State, charges that a portion of them are affected with the rankest disloyalty. Our judicial knowledge is thorough to the contrary. The people of *Indiana* are all for the Constitution, the Union as formed by it, and the laws enacted pursuant to it. No one is opposed to the Government, (using that word in the proper sense, and not as meaning the administration,) but only where opposition is expressed to any proceeding, to acts believed to be illegal and tyrannical, as perpetrated by individuals. The people of the State, in the language of an illustrious statesman now no more, are for Liberty and Union, one and inseparable, now and forever. They are, as we said above, and again repeat, devoted to the Constitution, the Union, and the laws, and with one accord, unite in the invocation—*Sunto perpetuæ.*

The following opinion was delivered in the same case by—

HANNA, J.—In the conclusion upon the legal points necessary to be decided in the case at bar, I fully concur; nevertheless certain propositions are advanced in the opinion, by way of argument, which I think are unnecessary and illogical, and, with that part of the argument, I do not agree, and desire to so say, although what I may say can not be strictly called a dissent. There are also some additional and somewhat different reasons which have presented themselves to

my mind, which I desire to offer, to sustain the conclusion of the Court. The theory upon which the conclusion arrived at is based, and very justly too, is that certain reserved and constitutional rights of a private citizen—the appellant—had been wrongfully wrested from him by the defendant, in the capacity of a military officer, in the face of the Declaration of Independence, and notwithstanding the express guarantees of the constitutions of the *United States* and of this State. The former is the foundation stone upon which the structure of our government is reared. It declares in emphatic language that men are "endowed by their creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; that to secure these rights governments are instituted among men, deriving their just powers from the consent of the governed." The constitution of the *United States* was framed to secure these, and provides that the "trial of all crimes, except in cases of impeachment, shall be by jury; sec. 2, art. 3; and the person of the citizen shall be secure from unreasonable seizures." 4 Amendment. The sixth amendment reiterates the right of one accused to a speedy trial by a jury. The constitution of the State also guarantees these rights; art. 1, secs. 11, 13 and 19; and in express terms declares that the "military shall be kept in strict subordination to the civil power." Art. 1, sec. 33.

In open disregard of all these guarantees, the appellant was seized without a legal warrant and punished, by imprisonment, without a trial. This punishment was inflicted under the semblance of military authority. The opinion, as prepared by Judge *Perkins*, is clear and satisfactory to my mind that, no legitimate authority was, under the circumstances, possessed by those who attempted thus to exercise it. If in this we are mistaken, then it follows that in this portion of the country, where no war, insurrection or rebellion exists, the will of a military officer becomes the law; yea, the su-

preme law, by which men may be deprived of property, their liberty, and even their lives; whereas, it is provided that the constitution, and laws passed in pursuance thereof, shall be the rule to regulate men's actions.    Art. 6.    I am aware it has become very fashionable for men, who have bestowed but little thought upon this subject, or who are blinded by fanaticism, to express a willingness to set at nought the constitution and the laws, if, in their opinion, they stand in the way of the adoption of favorite measures to suppress the rebellion.    Believing that a strict adherence to the constitution and the proper enforcement of the laws made in pursuance thereof, would greatly aid in the exercise of the just and sufficient powers of the government, which is the very best ever invented by the wisdom of man, I avail myself of this opportunity to put upon the record my protest against such dangerous doctrines, full of heresies towards a republican form of government, tending to consolidation, the ultimate erection of a monarchy, or military dynasty, which history informs us is always a despotism.

It will be observed that the judgment in this Court, in the case at bar, is based upon the theory of the unjust exercise of force by the military authority, and in the opinion many other instances of a like character are referred to.    The opinion then seems to assume, and it appears to me to step aside to assume, that to prevent territorial separation, we concede the necessity of keeping up the army, to whatever improper use it may be put by the administration.    This savors more of a political than of a legal proposition, and is, in my view the illogical part of the argument, is wide of the legal conclusion arrived at, and is, in effect, saying that to part with a portion of territory is the worst evil that can befal us.    Whilst, as a question of policy, all men are equally, perhaps, opposed to any division of territory, or separation of States, yet some honestly believe there are greater evils.    The frame work of

Griffin *v.* Wilcox.

our government has not been legally changed since it was first framed as the rule of action to govern some four millions of people, in thirteen States. It was yet the same at the commencement of this rebellion, when it included within its ample folds thirty millions of people in thirty-four States. It was equally adapted to the larger as well as to the smaller space. It is in point of fact and of law but the same government to-day that it was before the war—so far as States where no war exists are interested, for the people, who are by the theory of the government the source of all power, have not changed that form of government. Whether those who are, for the time being, administering the government, have been guilty of the exercise of powers not granted by the constitution, is quite another question. The government, as we have seen, was inaugurated to secure to each citizen certain unalienable rights—rights which have not been alienated, or transfered, to Congress, nor to the President, nor to the military commanders; for they could not be so conveyed and the people remain free, and when wrested from them by force they will become mere serfs. If those sacred rights, among which are the liberty of speech, the liberty of the press, and the freedom of elections, which are the three great bulwarks of free institutions, are to be stricken down, permanently destroyed by armed force; or, if that force is not to be used to restore the just authority of our once glorious government, but merely to establish, by wading through seas of blood, a single consolidated government, having for its corner stone certain chimerical ideas of philanthropy, fraternity and equality, social and political, of all races of men, without respect to color, then it might not be so readily conceded that imperative necessity would require that the force should be kept up solely for such purpose.

As to the act of Congress, set forth in the opinion, and upon which the decision of the lower Court is attempted to

be justified, it is necessary, perhaps, for a moment, to advert to the circumstances surrounding those who framed the constitution of the *United States*, to fully appreciate the provisions of that instrument, quoted as bearing upon said act. Previous to the revolution, the laws, usages and customs prevailing were, to a great extent, those of the mother country, for the colonies were subject to her control. History shows that in that mother country, instances had occurred of the assumption of unwarranted power, and the exercise of oppressive acts, by those administering the government, and that to shield themselves from the legal effect of their unjust acts, the oppressors, ministers in power, had procured acts of Parliament exhonerating them from liability to the outraged laws and injured citizens.

In *England* such statutes might be held valid, because they have no written constitution, and in their theory of government the Parliament is omnipotent; it has caused Princes to be crowned and Kings to be beheaded; it is supposed to be the voice of the governing power. In this country the people have said, in effect, by a written constitution, *this* power we give to the President, *this* to the Congress, and *this* to the federal judiciary. They wrote down the grant of power to each department. Beyond the passage of laws necessary to carry out those powers, Congress can not rightfully go. All other powers not thus delegated to either or all of those three departments, nor prohibited to the States, are reserved to the States respectively, or to the people. See 10 amendment. Not content with this definite grant of powers, and positive reservation of all other powers not so granted, certain stringent prohibitions and restrictions upon the action of the federal government and its departments were inserted. The very first line of the guarantees is that "Congress shall make no law," &c., &c. See 1 Amend. Const. U. S. Then follows, as I understand that instrument, the enumeration of

Griffin v. Wilcox.

various subjects upon which the Congress shall make no law infringing the rights of the people. Among those rights are life, liberty, and the right to possess and enjoy property, of which the citizen can not be deprived without due process of law; 5 amendment; and also to be secure from arrests, &c. 4 amendment. Now, it will be observed that in *England*, by the common law, the individual was, to a certain extent, protected in his person and his property. Yet that protection had been repeatedly disregarded by those in power, and the perpetrators of the wrong shielded by acts of Parliament, as before stated. Therefore to prevent such an unjust course of procedure, the constitution thus expressly sets up a barrier against the passage of a law by Congress authorizing the perpetration of such acts of wantoness by those in authority. Then the simple question is, if the Congress can rightfully pass no law authorizing the perpetration of wrongful acts, as to these reserved rights of the citizen, can it, after they have been committed, shield the offender by saying he shall not be responsible in damages to the sufferer. There is no question as to the pardoning power involved, for Congress possesses no such power. That power is lodged in the President and relates only to "offences against the *United States*," not to damages to one individual by the unlawful and injurious act of another. Art. 2, sec. 2, Const. U. S.

For these reasons, and those of a legal character given in the opinion of the Court, the judgment ought to be reversed.

*Per Curiam.*—The judgment is reversed, with costs. Cause remanded.

*John L. Ketcham*, for the appellant.

*E. A. Davis* and *T. W. Bowles*, for the appellee.