*John B. Niles*, for the appellants.

———◦◦◦———

REYNOLDS *v.* THE BANK OF THE STATE OF INDIANA.

The act of Congres making treasury notes a legal tender, is constitutional and valid, and the banks of *Indiana*, by redeeming their paper in treasury notes, do not expose their franchises to forfeiture. *Hanna*, J. dissenting.

APPEAL from the *St. Joseph* Circuit Court.

PERKINS, J.—On the 1st day of *April*, 1862, *John Reynolds* presented to the Branch, at *South Bend*, of the *Bank of the State of Indiana*, certain notes or bills issued by that Branch, in the exercise of power conferred by the charter of the bank,

and, within the usual banking hours, demanded their redemption in coin. The Branch refused to redeem the notes in coin, but offered to redeem them in treasury notes, issued under late acts of Congress, and declared, by act of Congress, to be a legal tender. These treasury notes, issued, as they are, upon no specie basis, but simply upon the indebtedness and credit of the government, and designed to circulate as money, fill the definition of bills of credit. The Circuit Court decided against the plaintiff, holding that the bank might redeem in treasury notes. The charter of the bank contains this section:

"Sec. 8. The said bank shall not at any time suspend or refuse payment, in gold or silver, of any of its notes, bills, or obligations, due or payable, nor of any moneys received upon deposit; and if said bank at any time refuse or neglect to pay any bill, note, or obligation, issued by such bank, if demanded within the usual banking hours, at the proper branch where the same is payable, according to the contract, promise, or undertaking therein expressed, or shall neglect or refuse to pay on demand, as aforesaid, any moneys received on deposit, to the person or persons entitled to receive the same, then, and in every such case, the holder of any such bill, note, or obligation, or the person or persons entitled to demand or receive such moneys, as aforesaid, shall respectively be entitled to receive and recover interest on their said demands, until the same shall be fully paid and satisfied, at the rate of twelve per centum per annum, from the time of such demand, as aforesaid; and any branch so failing to meet its engagements, may be closed, as in case of insolvency."

In the present condition of the country, if the bank proceeds, under this section of the charter, to redeem her circulation in coin, she will probably destroy herself, ruin a large portion of her debtors, and distress the people; while, on the other hand, if she is legally bound thus to proceed, and does not, she will thereby, also, put her own existence in jeopardy.

In this dilemma, the bank asks for a speedy decision of the pending cause, and the plaintiff joins in the request.

The Constitution of the *United States*, art. 1, sec. 10, ordains that no State shall "coin money; emit bills of credit; make anything but gold and silver coin a legal tender," &c. *Indiana*, in loyal submission to this limitation upon her power as a sovereign State, in framing her Constitution, provides, art. 10, sec. 7, that "all bills or notes, issued as money, shall be, at all times, redeemable in gold or silver;" and, as we have seen, the Legislature, in chartering the *Bank of the State of Indiana*, an institution created to issue a circulating medium of paper, required of her a compliance with this constitutional provision. Sec. 8 above quoted. From such compliance, the State can not release the bank; can the *United States* do so? is the question.

If the *United States*, under the Constitution, can make treasury notes a legal tender in payment of debts between citizen and citizen, she can make them thus between the States of the Union, corporations and citizens. And, coming now to the particular case before us, as the section in the charter of the Bank of the State above quoted was inserted to make it conform to the restriction upon the power of the State, imposed by the Constitution of the *United States*, viz: that a State shall not create money in the constitutional sense of that word, and shall not, by her own laws, recognize anything as such but gold and silver, it is not reasonable that we should construe that section as a restriction upon the right of the bank to avail herself of the privilege of using anything else as money, as a legal tender, which the *United States*, by her laws, might legally declare to be such. The true interpretation of the section must be that the bank shall not refuse to redeem her bills in what the Congress shall constitutionally make legal tender money. The bank can not be compelled to receive treasury notes from the citizen, in one hand, and

pay to the citizen gold and silver in the other. Under this construction of the charter, the act of Congress in question does not impair its obligation regarded as a contract. But, it may be remarked, if Congress can impair the obligation of contracts between citizens, in this particular, it can also, between citizens and corporations, and the States and corporations.

The decision of the cause, then, must turn upon the question, can Congress make treasury notes a legal tender? Can it make anything but gold and silver coin a legal tender? The answer to this question must be drawn from the Constitution of the *United States;* for it is a judicially established proposition that Congress can exercise such powers only as are granted, expressly or incidentally, by that instrument. And the same rule applies to every other department of the government.

It may be further observed, that if the proposition just stated is not true in every particular, then is our government, practically, one of unlimited powers, and the constitution a delusive bauble.

We proceed to investigate the question above propounded.

1. The power to make treasury notes, or anything else but coin, a legal tender, is not expressly given in the constitution. The money-making power is granted to Congress in these words: "Congress shall have power to coin money, regulate the value thereof, and of foreign coin."

2. Is such power granted as an incident to any substantive power? That it is not, the following considerations strongly tend to prove, viz:

1. The convention which adopted the constitution not only did not grant, but they expressly rejected it as a substantive power, and for the distinctly declared purpose of preventing its exercise, by Congress, under any pretext or circumstances whatever; and this, too, after the power had been once ex-

Reynolds *v.* The Bank of the State of Indiana.

pressly granted to the Federal Government; and the States subsequently ratified the constitution with this understanding.   Articles of Confederation, sec. 5; Elliott's Deb. vol. 1, pp. 258, 276, 413, and 531; Madison Papers, vol. 2, p. 1,232; 3 *id.* 1,343, *et seq.;* Curt. Hist. Const. vol. 2, pp. 328, 329, 364; 2 Story Com. on Constitution, 2d ed. commencing at section 1,358.

The above proposition is established by the debates in the convention; see Mad. Pap. *supra;* by the communication of members to their respective States; see Elliott's Deb. *supra;* and by the fact that members of the convention were members of the State ratification conventions.

2. Such paper is unequal to the functions of a national currency.

It is claimed that the power to emit bills is an incident to that of regulating commerce—that a medium of exchange, currency, is a necessity of commerce, and its creation an incident in the regulation of commerce.   This argument is not as satisfactory as could be wished.   It has apparent weaknesses.

1. As matter of fact, the bills are not emitted on account of commerce.   Commerce does not apply for their issue.

2. They are not needed for domestic commerce; for foreign they are useless.

3. Currency, as a medium of exchange, is a great necessity of commerce, and it is an acknowledged power of every government to ordain what shall constitute that currency.   Governments have done so; and, throughout the civilized world, they have all concurred in declaring that gold and silver shall be that currency.   Why they have so declared will be seen as we advance.   Now, the precise question of what should be the currency of this nation, what should be its medium of commerce, what should be used to meet that necessity, was the one that was before the convention which constructed the

frame of our government, and they ordained and established, by the paramount, the fundamental law of the nation, that that currency should be gold and silver, or paper issued upon, and as the representative, of gold and silver, and not bills of credit issued simply upon the indebtedness and faith of the government. Hence, it would seem that there could be no incidental power over this question connected with the regulation of commerce.

And here the question occurs, why was it ordained by our constitution that coin should constitute the currency of this nation? As we have seen, currency is the medium of commerce, is created for commerce, and it is a necessity that it should consist of something that will circulate co-extensively with commerce; but commerce is not limited by geographic lines; its domain is the world; the republic of commerce is as expanded as the globe. Hence, to be equal to the exigencies of the subject, the currency must consist of that which will circulate with equal credit all over the globe; something that possesses an intrinsic value—a value not dependent upon the duration or condition of governments, that revolutions and changes in political organizations will not affect; for commerce looks not to, and does not depend upon, the forms of such organizations. The gold and silver in the rebel republic to-day is as good, the world over, as is that of the old legitimate republic, while its bills of credit are becoming as worthless as withered leaves. Such a currency, the experience of the world proves, paper can not be. Said Mr. *Webster*, in his speech on the currency, in 1837: "I am for a sound currency for the country. And by this I mean a convertible currency, so far as it consists of paper. Mere government paper, not payable otherwise than by being received for taxes, has no pretense to be called a currency. After all that can be said about it, such paper is mere paper money. It is nothing but bills of credit. It always has been, and

always will be, depreciated. Sir, we want specie, and we want paper of *universal credit*, and which is convertible into specie at the will of the holder. That system of currency, the experience of the world, and our own experience, have both fully approved."

Says Mr. *Crawford*, in his report, in 1820: "By the term 'currency,' the issue of paper by government, as a financial resource, is excluded." Funding Systems, p. 734.

But while bills of credit will not furnish a sound currency themselves, they tend to exclude such a currency, viz: coin, from circulation, and to drive it from the country. As such paper will not circulate in foreign countries, the importer, when he has received his balances here in that medium, is compelled to go to the banks and brokers and exchange it for coin, which he takes abroad with him; and, at present, as our main produce-exports are cut off, their place must be supplied by specie; and, as the banks are not required to retain specie for the redemption of their own paper, if the bills of credit are a legal tender, they can and it is to be feared many of them will dispose of their entire stock, as it will command a premium over paper, and, ere long, this country be left with nothing but a pure paper medium, without the basis of a dollar of specie. To illustrate: The great bulk of our produce-exports, in years past, has consisted of cotton, tobacco and rice. The report of the Secretary of the Treasury for 1861, shows that the value of cotton, tobacco and rice exported in that year exceeded two hundred and ten millions of dollars. We are now deprived of these articles of export, and the vacuum must be filled by coin, or commerce be in proportion diminished. So, the interest on our vast bond-indebtedness to foreigners must be paid in specie.

The cotton crop of last year, it would seem, is to be burned, and it is scarcely possible that a crop should be raised this year, (the loss of two cotton crops in time of peace would

Reynolds *v.* The Bank of the State of Indiana.

revolutionize the commercial and financial world,) and thus, it would seem to be inevitable that a foreign demand will exist that must drain the entire specie from the country, as the counter home demand for it is removed by the bills of credit, if they are a legal tender; and when it is all exhausted, what will be done then?

These considerations were vividly in the minds of the convention that formed, and of the States that adopted our present constitution. They had before them the recent history of the issue of Continental and State bills of credit, and the disastrous results thereof to the country, and they determined to prevent a repetition of the evils. See the subject most thoroughly discussed in 2d Story on the Constitution, 2d edition, commencing at sec. 1348.

On the other hand, the legislative and executive departments of the Federal Government have, within the past year, for the first time in the history of the government, it is true, decided in favor of such a power, and have exercised it; and the disastrous consequences to the country that must follow a denial of the validity of that exercise of power, press hard upon the judiciary to sustain the violation of the constitution, if it be such, and thus create a precedent for further usurpations.

But with the tribunal of last resort, such considerations should not have influence. The preservation of the constitution, in its letter and spirit, should be an object outweighing, with that tribunal, all considerations of temporary inconvenience. That such would be the course of this Court, on a question arising under our State constitution, we think its past action will amply sustain us in asserting. In the case at bar, our decision is but that of a *nisi prius* Court, and we had better err in acquiescing in than by declaring null the action of Congress.

Influenced, then, by deference to the action of the Federal

Reynolds *v.* The Bank of the State of Indiana.

Government; by the rule that all doubts must be resolved in favor of the law, (a principle that tends constantly to augment the powers of limited governments,) by the exigency of the time, by the consideration of the local injury temporarily to our State that would follow a different decision, and the fact that the question can only be decided finally by the Supreme Court of the *United States*, we hold that the act of Congress making treasury notes a legal tender is within the constitution and valid. Such will be the ruling of this Court till the Federal Court shall determine the question otherwise.

The Bank, by redeeming in treasury notes, does not expose her franchises to forfeiture.

HANNA, J.—I would much rather a decision of the question presented and discussed in this case could, in the present crisis, have been avoided. But as, by the force of circumstances, over which I have no control, a compulsion seems to rest upon me to pass it, I deem it proper to say that, professing to be guided by the plain teachings of the constitution, and knowing in judicial decisions no higher law, I can not accord with the conclusion of the Court; for, conceding the facts and arguments, stated by the Court, to be legitimate, and it, in my opinion, as inevitably follows, as the light of high twelve succeeds the morning hour, that by the constitution the right is not vested in Congress to make a paper named a legal tender in payment of private debts. This would dispose of the question without considering the power of Congress to abrogate an express provision of a State constitution.

*Per Curiam.*—The judgment is affirmed with costs.

*Thomas S. Stanfield,* for the appellant.

*John B. Howe,* for the appellee.