THAYER *v.* HEDGES and Another.

CONSTITUTIONAL LAW.—1. At the adoption of the Constitution, all governmental power was in the States; and in the division of it made by the adoption of the Constitution, the Federal Government received only what was granted to it, the States retaining the residuum, except so far as it was extinguished entirely by prohibitions upon the States.

SAME.—2. The prohibition of a power to the States did not of itself, operate as a grant of the power to the Federal Government, but rather as an extinguishment of the power as a governmental one where a grant of it was not made in the Constitution to the Federal Government.

SAME—LEGAL TENDER.—3. The power to coin money is one power, and the power to declare anything a legal tender is another, and different power; both were possessed by the States severally at the adoption of the Constitution; by that adoption, the power to coin money was delegated to the Federal Government, while the power to declare a legal tender was not, but was retained by the States with a limitation, thus: "Congress shall have power to coin money," &c. "No State shall coin money"; and "no

Thayer v. Hedges and Another.

State shall make anything but gold and silver coin a legal tender," &c. States, then, though they can not coin money, can declare that gold or silver coin, or both, whether coined by the Federal, or the Spanish, or the Mexican Government, shall be legal tender. And as Congress was authorized to make money only out of coin, and the States were forbidden to make anything but coin a legal tender, a specie currency was secured in both the Federal and State Governments. There was thus no need of delegating to Congress the power of declaring a legal tender in transactions within the domain of Federal legislation. The money coined by it was the necessary medium.

SAME.—4. The words delegating to Congress power "to coin money," regulate the value thereof and "of foreign coin," do not include the right to make coined money out of paper. If they do, then the States have a right to make such money a legal tender. It does violence to the language to give it such a meaning.

SAME.—5. The power to declare paper a legal tender is not incidental to any power delegated by the Constitution.

APPEAL from the *Boone* Circuit Court.

PERKINS, J.—This suit was instituted upon a promissory note of the following tenor:

"$500. *March* 26, 1862.

"Four months after date we promise to pay to *Oel Thayer*, or order, 500 dollars in gold, value received, without any relief whatever from valuation or appraisement laws.

"JOHN W. HEDGES,

MARTIN C. KLEIGER."

The plaintiff prayed for a special judgment for the gold or its equivalent.

The defendant answered, alleging a tender of the amount due, before suit commenced, &c., in legal tender treasury notes, at their face.

A demurrer was overruled to this answer.

The plaintiff then replied, showing the depreciation of treasury notes, and the insufficiency of the tender, in amount, on that ground, but the Court held the reply bad, on demurrer.

The Court rendered a general judgment for the plaintiff for the amount of the note, but rendered judgment against him for the costs of suit, on the ground that a valid tender, in treasury notes, had been made before suit commenced.

The plaintiff appealed to this Court.

The points upon the rulings below were properly saved by exceptions.

The tender of the paper in question, in discharge of an express contract to pay in gold, was made, and sustained by the Court below, under the first section of the act of Congress, of *February* 25, 1862, which declares that treasury notes issued pursuant to it, shall "be lawful money, and a legal tender in payment of all debts, public and private, within the *United States,* except duties on imports and interest as aforesaid." Acts of Cong. 1862, (L. & B.'s ed.) p. 345.

If this clause of the act mentioned is constitutional, the tender in question was valid. If not, it was not.

We thus arrive at one of the questions that may be decided.

In considering this question, it will be convenient to first ascertain the precise character and purpose of the treasury note law.

It will not be difficult to do this.

In 1857, an act was passed by Congress, providing for the issue of twenty millions of treasury notes, and empowering the Secretary of the Treasury, among other things, "to borrow, from time to time, such sums of money, upon the credit of such notes, as," &c. Acts 1858, p. 257.

In *July,* 1861, another act was passed, entitled, "An act to authorize a national loan and for other purposes," which authorized the Secretary of the Treasury to borrow 250,-

000,000 dollars, and to issue bonds and treasury notes therefor, &c." Acts 1861, p. 259.

Again, in *August*, 1861, and again in *February*, 1862, acts were passed in relation to treasury notes as a means of obtaining loans, &c.; though no clause was inserted in any of these acts making the notes a legal tender.

But, on the 25th of *February*, 1862, another act was passed, authorizing a further issue of such notes, the act being one of the series upon this subject of treasury notes, it making reference to the previous acts, and treating the notes to be issued under it as a part of the government securities, but adding a provision additional to those in previous acts, making the notes issued under it a legal tender. Acts 1862, pp. 338, 345.

The purpose of the treasury notes, then, was to raise or supply money, and they pledge the government, upon their face, as security to the holder, to pay money for them. This is the form of the notes.

And the question is, could Congress compel creditors to receive paper in payment, generally, of debts due to them. We speak of the creditor and debtor portions of the mass of the people.

The Congress of the *United States* has, at different times, authorized the issue of three descriptions of paper, viz:

1. Paper by corporations, called banks.

The right to authorize this kind of paper does not come in question in the case at bar. It may, however, be observed in passing, that the Supreme Court of the *United States* has decided that if a bank of the *United States*, is a necessary and proper financial agent of the government, it is constitutional, if not, it is not. The experience of the last twenty odd years seems to establish the fact that it is not such an agent. *McCulloch* v. *Maryland*, 4 Cond. R. 466.

2. Bonds for money actually borrowed.

Of the right to issue this paper there is no doubt. The power to borrow money includes the power to execute a written acknowledgment of the debt created by the act of borrowing, and also a written promise to pay the debt.

3. Paper, in the similitude of bank notes, bills of credit, in fact, designed to circulate as money, as well as to accomplish a loan. See *Brisco* v. *The Bank, &c.,* 11 Pet. Rep. (U. S.) p. 257.

The right to issue such paper is not free from doubt. See *Reynolds* v. *The Bank,* 18 Ind. 457. It is held not to exist by *Mr. Curtis* in his History of the Constitution, vol. 2, p. 329. But the point need not be decided now. What we are at present considering is, can Congress proceed a step further and make paper issued under its authority, money, legal tender in payment of all debts? The answer to this question must be drawn from an examination of the Constitution of the *United States.*

And, first, let us ascertain what, exactly, is the operation of the act of Congress in question?

1. It makes an article other than coin, and an article as thus used, of no intrinsic value, legal tender money.

2. It thereby impairs the obligation of contracts by compelling creditors to receive, in discharge of them, less than half their value according to stipulation.

3. It operates as a fraud on the public creditors, and a hardship upon the honest public servants, by depreciating and debasing the currency.

4. In another aspect, it enables the government to make, by indirection, forced loans as actual if not as oppressive as those of Charles I, as they are made without interest, against the will of the lender, and without repayment of but a part of the principal; thus, in this case, as an example. The government desires *Thayer* to loan it 500 dollars. *Thayer* expresses his inability or unwillingness to spare the money. The government then goes to *Hedges* and *Kleiger,* and says to them,

Thayer *v.* Hedges and Another.

you owe *Thayer* 500 dollars, which you are about to pay him. The government wants that money, but he will not loan it. You pay it to the government, and it will give you a piece of paper which it will compel him to take of you, instead of the money contracted for, in payment of your debt.

5. It takes from the citizen his property against his consent and without just compensation.

Can the government constitutionally do these things, is the question?

This is a question of the gravest import. To arrive at a correct answer to it, it will be necessary to somewhat thoroughly analyze the legislative department of the Constitution of the *United States.* That analysis we shall attempt. We shall do it in no partizan spirit. All ought to desire to know aright our Constitution, and discussion and comparison of views are necessary to such knowledge. And especially, in times of difficulty, when the temptation to depart from it may be great, is the duty of watchfulness the more pressing, as the bad precedents of such times become the bad laws of times of tranquillity. Looking forward, as we hopefully do, to the complete suppression of the existing rebellion and the restoration of the Union under our revered Constitution, we are anxious that we may then find it in its integrity, unburdened by bad precedents, dangerous constructions and vicious interpretations.

We do not wish to be understood as intimating that the Constitution is beyond improvement; that progress will not render change necessary; but we do hold that such change, happily provided for in the Constitution itself, should be made in the mode therein prescribed. Ours is either a government of the Constitution, or it is not. If it is a government of the Constitution, then its execution, consistently with the laws made under it, is all the Federal Government that is necessary and proper for the welfare of the nation,

and all to which the States and people can be rightfully subjected.

The government of the *United States* is one whose sovereignty, limited territorially only by the boundaries of the nation, is yet circumscribed as to the objects upon which it can act. It is a government over specified subject matters. *Warren* v. *Paul* at this term and case cited, ante, p. 276. Most of the time since the settlement of this country by the whites, the people of the *United States* have lived under two governments acting upon them within the same territory. During our colonial State, we had the British for our general government, and the colonial, for our local governments. And it was one great source of controversy as to how far the British general government should have a right to exercise powers over the internal affairs of the Colonies, which were foreign and independent as to each other, but domestic and subject as to the British government. It was agreed that there were some matters pertaining to the general welfare of the Colonies as a whole, such as their foreign and inter-colonial trade, their common defence against the Indians and foreign enemies, which should fall within the power of the general government; but their internal, domestic affairs, the general welfare of the people of the several Colonies, and of the several Colonies themselves, in their domestic affairs, almost everything, indeed, except their common foreign relations, the colonists claimed should be left to the care and judgment of the people, and colonial governments, as the powers best calculated to manage them wisely and economically, and as the most safe to be trusted with them. The reader of history will not require citations of authorities to this point. One of the charges in the Declaration of Independence was that the King had assented to acts of Parliament for suspending our legislatures, and declaring that the Parliament had power to legislate for us in all cases whatsoever.

Thayer *v*. Hedges and Another.

By the Declaration of Independence, the Colonies threw off the British general government, rather than to submit to its encroachments upon matters pertaining to their several domestic, instead of confining its action to their foreign aggregate general welfare.

It then became necessary for them to create a new general government to manage matters pertaining to their general welfare, which term they used during their colonial State, as applicable mostly to matters connected with their foreign and inter-State relations, which latter were really then foreign, as the States were separate sovereignties.

The new general government was created by the Articles of Confederation, in 1788. There was no general government of authority, force, power, succeeding the British, before these Articles.

The first of these articles was this:

"The style of this confederacy shall be, ' *The United States of America.*' "

The third was as follows:

"The said States hereby severally enter into a firm league of friendship with each other, for their common defence, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretence whatever."

This was the second:

"Each State retains its sovereignty, freedom and independence, and every power, jurisdiction, and right, which is not by this confederation expressly delegated to the *United States* in Congress assembled," [or prohibited to the States.]

The part in brackets, which we have added, is necessary to the expression of the exact fact; for the articles not only

granted powers to the general government, but also prohibited some to the States.

The Union and general government, then, were formed to provide for the general welfare of the *United States,* but what was embraced by the term, general welfare; what powers might Congress exercise, and over what, in promoting it; what subjects were considered as pertaining to the general welfare designated in the organic law of the government?

This question is answered by showing the subjects over which power was given to Congress.

The principal powers were granted by Art. 9, and were these, as far as need here be set forth:

"SEC. 1. The *United States* in Congress assembled, shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article, of sending and receiving ambassadors; entering into treaties and alliances, provided that no treaty of commerce be made, whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever; of establishing rules for deciding in all cases what captures on land or water shall be legal, and in what manner prizes taken by land or naval forces in the service of the *United States* shall be divided or appropriated; of granting letters of marque and reprisal in times of peace; appointing courts for the trial of piracies and felonies committed on the high seas, and establishing courts for receiving and determining finally appeals in all cases of captures; *Provided,* that no member of Congress shall be appointed a judge of any of the said courts.

"SEC. 4. The *United States* in Congress assembled shall also have the sole and exclusive right and power of regulating the alloy and value of coin struck by their own authority,

Thayer *v.* Hedges and Another.

or by that of the respective States; fixing the standard of weights and measures throughout the *United States;* regulating the trade and managing all affairs with the Indians, not members of any of the States: *Provided*, that the legislative right of any State, within its own limits, be not infringed or violated; establishing and regulating post offices from one State to another, throughout all the *United States*, and exacting such postage on the papers passing through the same, as may be requisite to defray the expenses of the said office; appointing all officers of the land forces in the service of the *United States*, excepting regimental officers; appointing all the officers of the naval forces, and commissioning all officers whatever in the service of the *United States;* making rules for the government and regulation of the said land and naval forces, and directing their operations."

The prohibitions of power to the States were contained in art. 6, which we copy. The prohibitions related to general, mostly to foreign, affairs, as appears by the article, thus:

"ART. 6.—SEC. 1. No State, without the consent of the *United States* in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any conference, agreement, alliance or treaty, with any king, prince, or State, nor shall any person, holding any office of profit or trust under the *United States*, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state; nor shall the *United States* in Congress assembled, or any of them, grant any title of nobility.

"SEC. 2. No two or more States shall enter into any treaty, confederation or alliance whatever between them, without the consent of the *United States* in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue.

"SEC. 3. No State shall lay any imposts or duties which

may interfere with any stipulations in treaties entered into by the *United States* in Congress assembled, with any king, prince, or state, in pursuance of any treaties already proposed by Congress to the courts of France and Spain.

"SEC. 4. No vessels of war shall be kept up in time of peace by any State, except such number only as shall be deemed necessary by the *United States* in Congress assembled, for the defence of such State, or its trade; nor shall any body of forces be kept up by any State in time of peace, except such number only as, in the judgment of the *United States* in Congress assembled, shall be deemed requisite to garrison the forts necessary for the defence of such State; but every State shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutred, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition, and camp equipage.

"SEC. 5. No State shall engage in any war without the consent of the *United States* in Congress assembled, unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of delay till the *United States* in Congress assembled can be consulted; nor shall any State grant commissions to any ships or vessels of war, nor letters of marque or reprisal, except it be after a declaration of war by the *United States* in Congress assembled, and then only against the kingdom or State, and the subjects thereof, against which war has been so declared, and under such regulations as shall be established by the *United States* in Congress assembled, unless such State be infested by pirates, in which case vessels of war may be fitted out for that occasion, and kept so long as the danger shall continue, or until

the *United States* in Congress assembled shall determine otherwise."

Thus was clearly specified the national matters included in the term, general welfare. It had acquired a tolerably definite meaning, and was applied to subjects pertaining to foreign and inter-State relations.

And by art. 8, it was ordained that:

"All charges of war, and all other expenses that shall be incurred for the common defence or general welfare, and allowed by the *United States* in Congress assembled, shall be defrayed out of a common treasury," &c.

But the Articles of Confederation were extremely defective as a frame of government, particularly in points specified below. They violated the first principles upon which free governments, as well as efficient ones, must be framed.

1. They did not divide the legislative power between two branches.

2. They did not properly separate the legislative, executive, and judicial functions, assigning each to a separate department, but left them, mainly, in one body.

3. They did not empower Congress to lay duties, imposts, &c., to supply the government with money wherewith to pay the debts and expenses of the government, and as a means of regulating commerce.

4. They did not empower the government to levy taxes upon, and, through its own instrumentalities, collect them of the people for the purpose of paying debts, &c.

5. Generally, the government, under them, operated, in executing the powers it possessed, upon States, not upon individuals, and hence had no coercive power upon the States; which power is possessed under the present Constitution, by operating directly on the people of a State.

6. We may remark as a fact, that they made no provision for the return of fugitives from labor, &c., though such pro-

vision it is not pretended was a necessary element in a government.

The most immediate and pressing embarrassment experienced by the government under the Confederation, sprung from its inability to raise money wherewith to pay the debts and provide for the common defence and general welfare of the *United States.* As soon as peace was established, says *Mr. Curtis,* (Hist. Const. vol. 1, p. 384,) it became apparent, that while the Confederation was a government with the power of contracting debts, it was without the power of paying them. *Id.* p. 173, *et seq.* But the Congress did not claim that, under the pressure of necessity, or a latitudinous construction of the general welfare clause of the Articles of Confederation, it could assume power to raise money. The written charter of powers specified what might be done to provide for the general welfare; it clearly indicated the scope and meaning of that term, and Congress, in its actions, conformed thereto. But efforts were immediately commenced to procure from the States a further grant of power, by way of amendment to the Articles of Confederation, to enable Congress to levy duties, &c., for the express purpose of paying the debts, &c. The efforts were unsuccessful, but they resulted in the call of a national convention to revise the Articles of Confederation; which convention formed our present Constitution. And one of the leading objects, expressed at the time of calling the convention, was to obtain a grant of power to Congress to lay duties and taxes for the purpose of, or in order to pay the debts, and provide for the general welfare, &c. Curtis, *supra;* 1 Kent, 216; 1 Story on Const. sec. 255.

The proposed convention met in *Philadelphia* in 1787, and, in its action, departing from the purpose of simply amending the articles of confederation, went upon the theory that the continuity of the government was to be broken, the old con-

Thayer *v.* Hedges and Another.

stitution to be abrogated, and the new one to become the government of those States only which should voluntarily adopt it. It was not to be imposed upon any State by coercion. This is manifest from the fact that the new Constitution provided that it should be the government of the States adopting it; art. 7; and the further fact that the first Congress, under the new Constitution, in its legislation, classed those States which had not adopted the Constitution as foreign States. See 20 Ind. on p. 506. Hence, the correctness of the proposition of *Webster*, in his letter to *William Hickey*, Esq., on the 11th of *December*, 1850, that: "The Constitution of the *United States* is a written instrument; a recorded fundamental law; it is the bond, and the only bond, of the union of these States; it is all that gives us a national character." See the letter in the introduction to "The Constitution," by Hickey.

Hence, at the formation of the present Constitution, we may look upon the several States of the Union as remitted back to the possession, severally, of the entire sovereignty and independence of a nation; and as about, by the Constitution they were then forming, to severally voluntarily surrender a portion of that sovereignty to a new general government of their own creation; as about making a division of the sovereignty they then possessed with that government; giving it power over certain specified objects of a general nature, those pertaining to the general welfare of all the States in common; and, we may remark, it was one of the purposes of the Constitution mentioned to clearly define the subjects over which the proposed general government should have jurisdiction, to mark the boundary line of its authority, so that such controversies as had been had with the *British* General Government as to the extent of its rightful powers might be entirely avoided, and encroachments by the new general government prevented.

We look, then, to the letter of the Constitution to ascertain the powers, vested by its grants, in the general government, interpreting it in the light of its history where it may be ambiguous. And, we may add here, that war does not increase, nor peace diminish, the quantum of power actually granted to administration by the Constitution.

Indeed, it may not improperly be said that the Federal Constitution *is the Government of the United States,* though in common parlance we apply that term to administration. It was *the Constitution* that the convention formed, and the people ordained for their government. That Constitution provided for installing temporary administrations to administer, to execute the provisions of the Constitution, but it constituted no body of men as the government. It provided for placing men temporarily in office to execute the powers specified in the Constitution, and nothing more. The very preamble of the instrument declares this. It is:

"We, the people of the *United States,* in order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this CONSTITUTION FOR THE UNITED STATES OF AMERICA."

This Constitution, then, is, in fact, the government, created by our fathers, and when it dies, that government expires. And officers that carry on a government independent of a Constitution, constitute but a *de facto* government of assumed and unlimited powers. The Constitution is superior to administration, not administration to the Constitution.

*Mr. Webster,* in his great debate with *Hayne* on *Foote's* resolution, in 1830, expressly asserted that the Constitution was the Government of the *United States.* He said: "They [our fathers] ordained such a government; they gave it the name of *a Constitution,*" &c.

And the government thus created, let it be remembered, is complete within itself. It contemplates every contingency, and makes provision for each and all, and indicates the powers, embracing all that are necessary and proper, that administration may exercise in each and all. To assume the contrary, would be against the fact, and an impeachment of the wisdom of the fathers who made the Constitution. It provides for the time of peace, and the powers of administration therein. It provides for the contingency of foreign war, and the powers of administration therein. It provides for the contingency of insurrection and rebellion, and specifies the powers, and all the powers, necessary and proper to be exercised by administration therein. And the country had had experience in all these exigencies when the Constitution was formed.

The importance, then, of carefully studying that Constitution, assuming it to be still a living instrument, is manifest. Let us examine it. It creates three departments, and prescribes the manner of filling them with officers, and the powers and duties of the officers occupying them. The Constitution commences by declaring that:

"All legislative powers herein granted shall be vested in a Congress of the *United States*, which shall consist of a Senate and House of Representatives. [But] The powers not delegated to the *United States* by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Amendment 10.

This, then, locates all the governmental power in the *United States* that can be exercised by a legislature. A part of it is granted to the Federal Congress; and that part is all that it can exercise. All of the remainder, being that which is not extinguished by the prohibitions upon the States, is in the States and the people. The powers granted to Congress are these:

"Sec. 8. The Congress shall have power: To lay and col-

lect taxes, duties, imposts and excises, [in order] to pay the debts, and provide for the common defence and general welfare, of the *United States;* but all duties, imposts and excises shall be uniform throughout the *United States.* [The words, 'in order,' are inserted to express plainly the real meaning as historically proved above, and upon the authority of Walker's Am. Law, 4th ed., p. 125; 1 Story on Const. sec. 908, *et seq.;* 2 Curtis Hist. Const. p. 318, *et seq.*] To borrow money on the credit of the *United States;* to regulate commerce with foreign nations, and among the several States, and with the Indian tribes; to establish an uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the *United States;* to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures; to provide for the punishment of counterfeiting the securities and current coin of the *United States;* to establish post offices and post roads; to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries; to constitute tribunals inferior to the Supreme Court; to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions; to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the *United States,* reserving to the States, respectively, the appointment of the officers, and the authority of training the militia, ac-

cording to the discipline prescribed by Congress; to exercise exclusive legislation in all cases whatsoever, over such district, (not exceeding 10 miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the Government of the *United States*, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings."

Where, among this list of granted powers, is that to make legal tender money of paper? It is certainly not found among these express grants. And it would seem that it can not be treated as incidental to any granted power. It would seem that the power to declare what shall be money must be, in itself, a substantive power of the highest character; it has been so regarded in the history of nations. The convention so treated it in framing our Constitution, and prohibited it to the States, and expressly granted it to Congress, and expressly defined out of what it might be made, thus excluding the idea of a power in Congress to make it of anything else.

And here we can not forbear to step aside a moment from the line of discussion, appropriate to the case at bar, to notice another question of public interest, viz: that of the power to authorize the issue and suspension of the writ of *habeas corpus*. The Constitution places this power in Congress. It is contained in the clause, "to constitute tribunals inferior to the Supreme Court;" that is, to create Courts of original jurisdiction, and define their powers and regulate their practice. The *habeas corpus* is a judicial writ. It is issued at common law, or withheld only by Courts in given cases; and the power delegated to Congress to create and regulate Courts, is a power to that body, to grant to or withhold from Courts the right to issue or suspend judicial writs, among them that of *habeas corpus*. Hence, the propriety, necessity even, of

the clause in section 9 of the Constitution, the whole of which is devoted to limitations on the legislative powers granted to Congress generally in section 8, above quoted, forbidding Congress, in legislating upon the Courts, to authorize them to suspend or withhold the writ, except when Congress might so provide in cases of rebellion or invasion. See the *habeas corpus* act of 1789, in Brightly's Dig. p. 301; also *Griffin* v. *Wilcox,* 21 Ind. 370, and *Warren* v. *Paul,* ante, p. 276.

Returning from this digression to the point of departure, viz: that there was no express power granted to Congress to make paper a legal tender, we proceed to further illustrate that point. In doing so, we commence by laying down the following propositions:

1. At the adoption of the Constitution, all governmental power was in the States; and in the division of it, made by the adoption of the Constitution, the Federal Government received only what was granted to it, the States retaining the residuum, except so far as it was extinguished entirely by prohibitions upon the States.

2. That the prohibition of a power to the States did not of itself operate as a grant of the power to the Federal Government, but rather as an extinguishment of the power, as a governmental one, where a grant of it was not made in the Constitution to the Federal Government.

3. That the power to coin money is one power, and the power to declare anything a legal tender is another, and different power; that both were possessed by the States severally at the adoption of the Constitution; that by that adoption, the power to coin money was delegated to the Federal Government, while the power to declare a legal tender was not, but was retained by the States with a limitation, thus: "Congress should have power to coin money," &c.; "no State shall coin money," and "no State shall make anything but gold and silver coin a legal tender," &c. States, then, though

Thayer *v.* Hedges and Another.

they can not coin money, can declare that gold or silver coin, or both, whether coined by the Federal, or the Spanish or the Mexican Government, shall be legal tender. And as Congress was authorized to make money only out of coin, and the States were forbidden to make anything but coin a legal tender, a specie currency was secured in both the Federal and State governments. There was thus no need of delegating to Congress the power of declaring a legal tender in transactions within the domain of Federal legislation. The money coined by it was the necessary medium.

4. That the words delegating to Congress power "to coin money," regulate the value thereof, and "of foreign coin," do not include the right to make coined money out of paper. If they do, then the States have a right to make such money a legal tender. It does violence to the language to give it such a meaning.

We next proceed to inquire whether the power to declare paper a legal tender, on the supposition that such power could be an incidental one, is a necessary and proper incident to any granted power, as a means of carrying such power into effect; for the grant of a substantive power carries with it necessary and proper incidents where they are not expressly withheld. They were withheld in the articles of confederation, but were expressly restored in the Constitution, thus: immediately following the express delegation of powers is added, "and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the *United States,* or in any department or officer thereof." And we lay down the proposition at the outset that no power, in itself a substantive one, can be exercised or contravened by action under an incidental power. And the further proposition that where a substantive power is granted in a given form and to an exactly defined extent, or is thus withheld,

the grant or prohibition can not be exercised or contravened by a power claimed as incident to some other substantive power. Hence it would seem clear that the granted power to coin money out of coin, can not be enlarged as an incident to the grant of some other power, into a power to issue paper money.

Even the President of the *United States*, by virtue of his powers as commander-in-chief of the army and navy, can not by his orders protect his subordinate officers from liability to damages for illegal acts they may perform under such orders. At least, it was so decided by the *United States* Supreme Court in *Little* v. *Barreme*, 1 Cond. Rep. 378; see, also, *Griffin* v. *Wilcox*, 21 Ind. 310. There is a limit to incidental powers in all departments of the government. *Griffin* v. *Wilcox, supra.* Recurring, then, to the above grant of incidental powers, we are not aware of any one, among the "other powers vested by this Constitution," &c., mentioned therein which would authorize this legal tender law; to which one of the grants, or to what combination of those quoted, is such a law a necessary incident? For Congress, as has been said, can not legislate upon the internal domestic affairs of the States and people, any further than the particular subjects confided to Congress reach, no further than is necessary to carry into effect the special powers granted. For example, Congress could not pass a law regulating, generally, evidence or practice in State Courts; registry of deeds, marriage contracts, limitation or usury laws, or contracts of renting, purchase and sale of property, &c., in *Indiana*, except where they were made with the general government, its officers, &c., or where the law was touching some matter, such as the post office, process in Courts of *United States*, &c., within the domain over which the Constitution grants power to Congress. *Griffin* v. *Wilcox, supra.* See the very able opinion of Judge *Denio* in the case of *Meyer* v. *Rosevelt*, in the N. Y. Court of

Appeals, *September*, 1863, in most of which this Court fully concurs. Particularly do we concur with him in the position that it does not follow, from the fact that Congress can prohibit the taxation of treasury notes by States, that it can also force one private citizen to take them of another for what they are not. The reasoning of those judges who thus hold is this: Congress can prohibit States from taxing government paper; therefore it can force a citizen to take it as gold. Congress can prohibit States from taxing government mules; therefore, if one citizen has a contract with another to furnish him a milking cow, Congress can compel him to take a mule as being a cow; Congress, in that case, having the power to make a mule a cow by enactment. But, says Lord *Bacon,* "gold hath these natures, greatness of weight, closeness of parts, fixation, pliantness or softness, immunity from rust, color or tincture of yellow; therefore, the sure way, though most about, to make gold, is to know the causes of the several natures before rehearsed, and the axioms concerning the same. For if a man can make a metal that hath all these properties, let them dispute whether it be gold or no." Bacon's Works, by Montague, vol. 2, p. 50.

Congress, as we have seen, takes no power under the general welfare clause, as that is not a grant of any power, but a mere expression of one of the ends to be accomplished by the exercise of the powers granted. And should Congress assume, upon its own ideas of general welfare, to exercise other powers than those granted, to carry them out, it would simply, to that extent, set up a despotism.

The legal tender law is not an incident of the power to borrow money, because that power does not, in any reasonable view of the subject, imply the power to make forced loans, to take the citizens property without his consent, and without just compensation. To borrow, is not generally understood as taking by force or fraud. We have seen that the

legal tender paper clause is an authority to make, by indirection, forced loans. It is not an incident of the power to raise armies, because the Constitution has expressly provided the modes of raising money to pay them; hence, incidental modes are excluded, unless the incidental legislation be limited to operate upon the army itself. It is not an incident of the power to regulate commerce with foreign nations, between the States and with the Indian tribes. The legal tender law is not an attempt to regulate such commerce, except so far as it attempts to provide a medium of exchange of productions. But the Constitution has fixed that medium, viz: coined money; paper is not only not a "necessary and proper medium for such exchange;" it is not one of a class of means consistent with the Constitution; it is one which the commercial republic of the world actually rejects, and which the power of government can not compel it to accept. And whether it is of the class of proper means is a judicial question. 1 Kent 254. Gold and silver have been chosen by the commercial world as the medium of commercial exchanges and the measures of commercial values; chosen, not by the compulsion of governments, but voluntarily, from utility and convenience, and governments acquiesced in the choice and sanctioned it, and no power of government can compel their abandonment. See Smith's Wealth of Nations, pp. 16, 176, 179. They became legal tender by the *lex mercatoria* of nations, and contracts, made without specifying a medium of payment, were understood, by the law of nations, to be payable in coin. The history of the world shows this. Say's Pol. Economy, p. 222; 2 Mill's Pol. Economy, p. 19; 18 Ind. 471. Coin was the sacred currency as well as profane, of the ancient world. Historically considered, we find that the Almighty, and his Prophets and Apostles, were for a specie basis; that gold and silver were the theme of their constant eulogy. *Abraham,* the patriarch, 1875 years before Christ, being about 3740

Thayer *v.* Hedges and Another.

years ago, purchased of *Ephron*, among the sons of *Heth*, the field in which was the cave of *Machpelah*, shaded by a delightful grove, for the burial place of his dead; and he paid for it "400 sheckles of silver, current money with the merchant." Gen. 23, 16. So *Solomon*, the wisest of men, seems to have had a decided preference for a hard money currency. In 1st of Kings, chap. 9, verses 27, 28, for example, it is said: "And *Hiram* sent in the navy his servants, &c., and they came to *Ophir*, and fetched from thence gold 420 talents, and brought it to King *Solomon*." And in chap. 10, verses 14, 15 and 29: "Now the weight of gold that came to *Solomon* in one year was 666 talents, besides that he had of the merchant-men, and of the traffic of the spice merchants, &c.; and a chariot came up and went out of *Egypt* for 600 shekels of silver, and a horse for 150 shekels," &c. Again, the prophet *Jeremiah*, one of the "greater prophets," says, chap. 32, verses 9 and 10: "And I bought the field of *Hanameel*, my uncle's son, that was in *Anothoth*, and weighed him the money, even 17 shekels of silver, and I subscribed the evidence and sealed it, and took witnesses, and weighed the money in the balances." *Walker*, in his Am. Law, p. 145, declares it an act of despotic power to make paper a legal tender. The principal interference of government with the currency has been to debase it. *Say* gives an account of the acts of the French monarchs, of this character, in his Political Economy, book 1, chap. 21, § 5, and adds: "Let no government imagine that, to strip them of the power of defrauding their subjects, is to deprive them of a valuable privilege," &c. Says *Mr. Gouge:* "No instance is on record of a nation's having arrived at great wealth without the use of gold and silver money. Nor is there, on the other hand, any instance of a nation's endeavoring to supplant this natural money, by the use of paper money, without involving itself in distress and embarrassment."

It was the intention, by the Federal Constitution, to withhold this power of supplanting natural money from the general government, and to strip the States of it, and thus extinguish it, and insure to the people and nation a sound currency forever. Of this we have not the slightest doubt. Money should be to values, what weights and measures are to quantities, the exact measure, and a uniform, stable one. The States were prohibited from making anything but gold and silver a tender for debts, and the general government was authorized, touching this subject, only "to coin money, regulate the value thereof, and of foreign coin," and to provide for punishing the counterfeiting of two things, viz: the "securities," that is the bonds, &c., and the "*current* coin of the *United States*," that is the circulating money, coined by authority of Congress. It will be observed that while the States are forbidden to make anything but gold and silver a tender, Congress is empowered to coin money, without being limited to the two kinds of coin to which the States are restricted. Hence, Congress has, for small change, coined copper; but that the term, "to coin money," means to make money out of coin, and nothing else, the history of the Constitution, as well as the natural interpretation of the words, demonstrates. If the words "to coin money," mean to coin it out of paper, then the words "foreign coin" include any paper money coined by any foreign government, and the clause in which they occur authorizes Congress to make such paper a legal tender among our people; for if paper can be coined, why, it is coin, after it has been coined. Hence we are clear that the paper legal tender law is not an incident of the power to coin money. It is not an incident to the treaty making power. Acquisition of territory, we admit to be a natural incident of that power. Boundaries between nations must be fixed by treaty, and the final possession of conquered territory at the end of a war must be determined by treaty; and

Thayer *v.* Hedges and Another.

pecuniary obligations may, also, be imposed upon the nation by such treaty arrangements. A treaty is a bargain which the Constitution authorizes the government to make, and it may relate to land or money, &c.; but the money to discharge the obligations thereby created must be raised in the modes prescribed by the Constitution.

It is not an incident of the power to collect the dues and pay the debts of the *United States.* That power, in connection with the constitutional provision, that the laws of the *United States,* made pursuant to the Constitution, shall be the supreme law, may well enough justify the act giving the *United States* priority of payment out of the effects of an insolvent debtor. See *Conrad* v. *The Atlantic, &c. Co.,* 1 Pet. U. S. Rep. 385.

It will be observed that we here say nothing about the necessity or propriety of authorizing, in any exigency, paper like bank paper, so secured as that it shall be voluntarily circulated as currency by the people; they receiving it, not by compulsion, but freely, through confidence that its final redemption is certain and near. That question is not before us. Treasury notes might thus circulate without legislative compulsion.

A further view of the question, in brief.

The Constitution declares that Congress shall have power "to coin money, regulate the value thereof, and of foreign coin;" and that "no State shall coin money, or make anything but gold and silver coin a tender in payment of debts."

Now, the power is no where expressly given to Congress to make even coin a legal tender, but the prohibition to the States to make anything but gold and silver such tender, goes upon the assumption that the power over the subject of legal tender is possessed by the States; see *Hopkins* v. *Jones,* post, p. 310; and the Constitution restricts them to two articles, either or both of which they may make thus; and the general gov-

.ernment has not the power to make anything a legal tender except as an incident to the power to coin. It is, perhaps, a fair incident to the expressly delegated power to make money of coin, to make the thing coined as money a legal tender in transactions within the sphere of legislation by Congress, but certainly nothing beyond that thing; for that would be drawing a second incident from a first; hanging an incident upon an incident, which certainly, we think, could not be done. State the argument.

Congress has express power to make money out of coin. Incident, perhaps, thereto; to make such coin a legal tender. Can we now, with a show of reason, add that incident to the doubtful incident of making coin a legal tender, may be exercised the substantive power, not expressly granted, of making paper legal tender money?

But we will not pursue this discussion of the constitutional question. We feel entirely justified in calling attention to the subject to the extent of the remarks we have made, as pursuing one of the modes by which the memory of the Constitution may be kept alive, and interest in its preservation excited.

It is contended that we might decide this case on the ground that the suit is on a note payable in a specific article. That note is not payable, by its terms, "in specie," nor "in coin," nor in "gold and silver," nor generally, but "in gold." Now gold is used as an article of merchandise, of manufacture, &c., as well as for currency and a standard of value. And if a contract is made between two parties in which one gives to the other a consideration for his promise to deliver to him in the future a quantity of gold dust, bullion, coin, or simply of gold, why shall not such contract be enforced? Such the contract sued on must be taken to be. And if the defendants can, by virtue of the legal tender paper law, discharge their promise to pay gold, by paying paper at its face, which is

less in value, by more than half, than the gold, then the obligation of the contract has been impaired and the plaintiff has been deprived of more than half of his property, in the given case, without compensation. Such is the incontrovertible fact. And is it possible that the Courts are without power to redress such wrongs? See art. 5, amendments to Const. U. S.

Courts may decree specific performance of contracts for personal property, or give equivalent damages, where it may be necessary to effectuate a just result between the parties. This is well settled. Fry on Specific Performance, Am. ed., side p. 13, top p. 55, notes; 2 Story's Eq., sec. 717, *et seq.*; *Chamberlain* v. *Blue et al.*, 6 Blackf. 491. Judge *Story* says: "Whenever, therefore, the party wants the thing in specie, and he can not be otherwise fully compensated, Courts of equity will grant him a specific performance." "And this constitutes the true and leading distinction," &c.; "it does not proceed upon any distinction between real estate and personal estate." "The truth is, that, upon the principles of natural justice, Courts of equity might proceed much farther, and might insist upon decreeing a specific performance of all *bona fide* contracts." Story, *supra.*

The circumstances under which the note in question was given, might, perhaps, appear on a new trial. Law and equity are both administered under the code in one form of proceeding.

But a majority of the Court are not prepared to decide the case on this latter ground. If the legal tender notes are money, coin, they are the standard of value, they are the measure of all other values, and nobody can be compelled to pay more than the face value of the standard of value in money. This, in itself, shows the folly of attempting to declare that to be the standard of value which the commercial

and financial republic of the world always has and always will reject as such.

Having fully presented the views of the Court on the constitutional question, in which we unanimously hold the legal tender provision void, we shall as we did in the case of *Reynolds* v. *The Bank of the State*, 18 Ind. 467, and for the reasons there given, *pro forma*, affirm the judgment below. We are advised that the question is before the Supreme Court of the *United States*, the ultimate tribunal to settle it, and a petition for rehearing may, if the party desires, keep open the question and save all rights as they may be finally settled by that tribunal.

*Per Curiam.*—The judgment below is affirmed, with costs, and ¼ of 1 per cent. damages.

*A. J. Boone*, for the appellant.